IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Karry Walker, ) | Civil Action No. 8:15-cv-00301-MGL-JDA |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| ) | **OF MAGISTRATE JUDGE** |
| City of Clemson, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the Court on Defendant's motion for summary judgment. [Doc. 31.] Plaintiff alleges retaliation claims pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). Pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(A) and Local Civil Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Plaintiff filed this action on December 9, 2014 in the Pickens County Court of Common Pleas [Doc. 1-1], and Defendant removed the action to this Court on January 22, 2015 [Doc. 1]. On January 29, 2016, Defendant filed a motion for summary judgment. [Doc. 31.] Plaintiff filed a response in opposition on February 23, 2016 [Doc. 35]; Defendant filed a reply on March 4, 2016 [Doc. 39]; and Plaintiff filed a sur-reply on March 7, 2016 [Doc. 40]. Accordingly, the motion for summary judgment is ripe for review.

## BACKGROUND

Plaintiff began working as a dispatcher for Defendant's police department in 1989. [Doc. 31-13 at 10:6–12.] After two or three years, she was promoted to parking enforcement and then went to the police academy and became a certified officer. [*Id.* at 10:13–24.] Plaintiff continued as a patrol officer in different capacities until she was

promoted to captain in 2003. [*Id.* at 11:3–16.] She remained a captain until she was promoted to major in 2009. [*Id.* at 11: 25–12:8.] Plaintiff received above average performance ratings [*see, e.g.*, Doc. 31-14 at 18–23, 43–47] and never received any disciplinary actions while employed by Defendant [Docs. 31-7 at 38:16–18; 31-9 at 9:25–102].

**Plaintiff's Complaints**

### *2006 Complaint*

In 2006, Plaintiff sent a letter to Defendant's Chief of Police, Jimmy Dixon ("Dixon"), expressing concern over the promotion of Robert Griffin ("Griffin") to major. [Doc. 31-13 at 14:7–16:5; Doc. 31-14 at 1–2.] Plaintiff's concern was that the position had not been advertised and, therefore, she did not have an opportunity to apply. [Doc. 31-13 at 14:7–14.] In the letter, Plaintiff alleged the department had not followed its own policy in promoting Griffin and also stated it is important "to adhere to certain civil rights regulatory requirements that enable a city such as Clemson to continue to receive all forms of governmental funding." [Doc. 31-14 at 1–2.] Plaintiff indicated that she was unsure whether she should file a formal grievance. [*Id.*] However, after receiving a response from Dixon dated September 14, 2006 [*id.* at 3–6], Plaintiff wrote to Defendant's City Administrator, Rick Cotton ("Cotton") [*id.* at 7– 9], who responded on October 6, 2006 [*id.* at 10–13]. Next, Plaintiff formally presented her grievance to Defendant's Employee Grievance Committee, which found that no formal procedure was violated and there was no evidence of any discrimination during the process. [*Id.* at 16.] However, the Employee Grievance Committee recommended that potential candidates be notified of future promotion opportunities for which they qualify so that they could formally apply. [*Id.*] On

November 10, 2006, Defendant's Mayor notified Plaintiff that City Council had voted unanimously to uphold all actions taken by Dixon and Cotton and were in agreement that "there was proper authorization to reactivate the Major position, that the process utilized to fill the position was correct and did not violate any City policy, and that there was no discriminatory bias in the process." [*Id.* at 17.] Plaintiff went to the Equal Employment Opportunity Commission ("EEOC") in 2006 or 2007 regarding Dixon's failure to follow the hiring policy, but she decided against filing a charge of discrimination at that time. [Doc. 35-1 ¶ 2.]

### *2013 Complaints*

On June 20, 2013, Plaintiff sent the following message to Dixon via electronic mail[1]:

> I need to take some time off to think about some things. I was disturbed and disappointed in a comment you made yesterday and how you handle incidents involving people of color. Examples: CU black student lying the roadway of 123, you do nothing until two days later because the parents are inquiring about the investigation, now a transient black man living space is burned with the words "leave nigger" sprayed on it and you think it is inappropriate, not racists....Really? there are others but I will not name them all. I was shocked that you, Chief of Police of 30+ years could not identify a hate crime. I believe in doing the right thing regardless of the who it affects but it's apparent you do not think that way which is a problem.
>
> I will advise you of the days I would like to take and let you know. I will also send another email to recap what occurred yesterday.

---

[1]This message was in response to events on June 19, 2013, when Defendant dispatched an officer to investigate an arson claim where the victim lived in a tent style lean-to and reported that he returned to the lean-to to find it burning with a piece of plywood in front with the words "Leave Nigger" spray painted in black paint. [Doc. 31-14 at 25.]

3

[Doc. 31-14 at 24.] Dixon responded, asking for the days Plaintiff was going to be away and informing her that he did not need another electronic mail message. [*Id.*] That evening, Plaintiff sent another message, reiterating her concern regarding how Dixon handled the investigation and making clear that Plaintiff believed the alleged arson was a hate crime. [*Id.* at 26–27.]

On June 25, 2013, Plaintiff sent another electronic mail message to Dixon regarding vandalism to her car. [*Id.* at 39.] In the message, she recapped a meeting between Plaintiff and Dixon, during which she notified Dixon that her car had been keyed and someone had tampered with the passenger window by moving the mirror. [*Id.*] Plaintiff believed Dixon had shared the content of her previous electronic mail message and that his sharing that information provoked the damage to Plaintiff's vehicle. [*Id.*] She stated that she felt threatened and wanted to make Dixon aware of the situation so that he could make sure it did not happen again to anyone. [*Id.*] Plaintiff also advised Dixon that if anything happened again, she would file a complaint with the EEOC. [*Id.*]

On July 22, 2013, Plaintiff sent another electronic mail message to Dixon, recapping a conversation between Plaintiff and Dixon the week before. [*Id.* at 38.] Plaintiff expressed issues and concerns about the agency, including Dixon's approval of dispatchers working security. [*Id.*] Plaintiff shared that morale was low; she had heard from previous and current employees regarding indiscretions and inappropriate behavior from persons in command, including Dixon; the department was the most divided it had been in 25 years; and employees expressed disrespect toward Dixon and how he managed the department. [*Id.*] Plaintiff testified that she was referring to comments Dixon made to dispatchers that made them uncomfortable. [Doc. 31-13 at 87:17–88:10.]

4

On September 12, 2013, Plaintiff sent an electronic mail message to Dixon and copied Tracy Taylor ("Taylor") in Defendant's Human Resources department, requesting a meeting with Dixon and Sergeant Brenda Link ("Link") to resolve some issues between Plaintiff and Link. [Doc. 35-4.] Plaintiff reported that she had attempted to speak with Link regarding statements Link made to Dixon and an outburst Link had in the supervisor's suite, but Link would not talk to Plaintiff.[2] [*Id.*] Plaintiff stated that she was tired of the drama, lies, and harassment, that she had already expressed to Dixon she would not tolerate anymore harassment and lies, and that she held him responsible. [*Id.*]

**Link's Complaint**

On September 13, 2013, Link sent a five-page letter to Cotton, notifying him of her intent to file a grievance against Plaintiff. [Doc. 35-6.] She complained that Plaintiff had been singling her out and bullying her and that she had asked for help from Dixon only to have the behavior continue.[3] [*Id.* at 2.] In the letter, Link outlined five examples of the behavior about which she was complaining—Plaintiff disagreed with Link's classifying a crime as a burglary, and Link's work assignment and duties were changed as a result; Plaintiff complained to Major Griffin about Link's behavior in training when the instructor had

---

[2]On September 10, 2013, Plaintiff sent an electronic mail message to Dixon, informing him that she had learned that a police dog under Link's command jumped on another employee. [Doc. 31-14 at 41.] Plaintiff expressed her concern regarding liability issues with the dog. [*Id.*] Link found out that Plaintiff had informed Dixon and "had an outburst talking about she was going to get me and she couldn't take it anymore." [Doc. 31-13 at 104:2–24.] After Plaintiff heard about the outburst, she talked with Dixon, who told Plaintiff to talk to Link. [*Id.* at 105:1–10.]

[3]Link complained to Dixon on several occasions about how Plaintiff treated Link. [Doc. 31-9 at 11:7–25.] Dixon did not discipline Plaintiff based on these complaints. [*Id.* at 26:13–24.]

5

no complaints; Plaintiff questioned Link's working extra duty even though Plaintiff was not Link's supervisor and had no reason to follow her work schedule; Plaintiff questioned Link's time sheets but did not question others' time sheets; and Plaintiff reported a situation with Link's K-9.  [*Id.* at 2–5.]  Link believed Plaintiff was singling her out and treating her differently to try to get Link to quit her job.  [*Id.* at 6.]

**Investigation and Report**

After receiving Link's written complaint, Cotton asked City Attorney Kay Barrett ("Barrett") to investigate Link's grievance.  [Doc. 31-7 at 15:5–6.]  Because the department lacked an internal affairs division and because Link shared that she did not think Dixon had been taking her complaints seriously enough, Cotton thought it would be best to have a third-party do the fact-finding.  [*Id.* at 14:23–15:24.]

After meeting with Cotton, Link, Dixon, Plaintiff, and sixteen others,[4] Barrett submitted a report of her investigation on October 14, 2013.[5] [Doc. 31-4 at 1–8.] In the report, Barrett provided a summary of what the persons interviewed stated:

| Statement | No. of Individuals Who Made Statement |
|---|---|
| Morale in the department was very low and getting worse.  Everyone was beginning to feel the toxicity in the work place and felt that a lot of the problems related back to Major Walker. | 13 |
| Employees felt like nothing was being done about the problem.  They were confused and disheartened that no action had been taken.  They had resigned themselves to the situation and felt that it will not change. | 13 |
| Plaintiff was a stirrer and liked to create waves.  She would create tension where there was none. | 12 |

---

[4]Barrett met with Detective James Peppers, Victims Advocate Nikki Munn, Captain Jeff Stone, Captain Matt Culbreath, Lieutenant Richard Gooch, Sergeant Josh Caldwell, Warrant Officer Alex Kiliszewski, Municipal Court Clerk Christie Kernells, Lieutenant Nate Heard, Master Officer Jay Hogue, Master Officer Kevin Shaw, Master Officer Mike Arflin, Detective Tate Brown, Dispatcher Sha Boggs, Records Specialist Liz Maxwell, and Lieutenant Robert Crooks.  [Doc. 31-4 at 3–4.]  Link suggested that Barrett speak with twelve of these sixteen individuals [*id.* at 1]; when asked, Plaintiff said there was no one else she wanted Barrett to meet with regarding the situation [*id.* at 3].

[5]Before writing her report, Barrett met with Cotton and Dixon to review her findings.  [Docs. 31-3 at 11–23; 31-7 at 13:19–23.]  Cotton asked Barrett to give Plaintiff an opportunity to meet with Barrett to hear the issues and respond to them before Barrett finalized her report.  [Doc. 31-7 at 16:12–17.]  Barrett offered Plaintiff the opportunity to meet about Barrett's findings and give Plaintiff a chance to respond, but Plaintiff would not meet with Barrett unless Barrett provided the information electronically to Plaintiff first.  [Doc. 31-14 at 51–53.]  Barrett testified that she did not provide the information to Plaintiff electronically because she had no written report at that point and no list of questions for Plaintiff; Plaintiff wanted a copy of Link's complaint, and Barrett felt it was not her position to give it to Plaintiff.  [Doc. 31-3 at 108:13–20.]

| Statement | No. of Individuals Who Made Statement |
|---|---|
| Plaintiff had very few leadership skills.[6] | 12 |
| Plaintiff bullied Link and said negative things about her and to her. | 11 |
| Plaintiff had spoken in a derogatory manner to or about Link and others in the department, including in public. | 11 |
| Plaintiff was not a team player. | 11 |
| Plaintiff bullied and harassed not only Link but also other members of the department.  She tended to get in people's faces and yell at them or stomp around the office slamming doors if she was not happy with a particular situation. | 10 |
| Plaintiff was not working the hours that she should have been working and was rarely at the police department. | 10 |
| Employees did not look forward to coming into the department unless Plaintiff was absent.  They felt there was a tension in the air when she was there and everyone was walking on eggshells. | 10 |
| Plaintiff felt that she was always right and did not like to be corrected.  She did not talk with people; she talked at them or down to them. | 10 |
| Plaintiff was not always familiar with police procedures or constitutional issues.  The officers did not trust her judgment in these matters. | 8 |
| Plaintiff looked for problems, not necessarily to fix them, but to put down the persons making the mistakes. | 8 |

---

[6]Two of the people interviewed said that they would go to Plaintiff if they had a problem in the department.  [Doc. 31-4 at 5–6.]

| Statement | No. of Individuals Who Made Statement |
|---|---|
| Plaintiff was inconsistent in her verbal expectations and email directives, often changing them without notice. | 6 |
| Plaintiff often dressed inappropriately in the office, even when she interviewed people, sometimes in a sweatshirt, sometimes in spandex, often right after working out. | 5 |
| Plaintiff was harsher with and more demanding of Team I than Team II. | 5 |
| Some employees thought Plaintiff bullied Link more than others because Link has a strong personality and did not hesitate to speak back to Plaintiff and correct her when she was wrong. | 4 |
| If the situation continued in its present state, employees stated they might leave the police force even though they wanted to stay and would take a pay cut if they left. | 4 |
| It was not unusual for officers to call in to the department to find out if Plaintiff was in the building or drive by to see if her car was there. If she was not there, they would come in; if she was there, they did not come in. | 3 |
| Some employees supported Plaintiff and did not think there was a problem between her and Link. | 3 |
| Some employees respected Plaintiff. | 2 |
| Plaintiff visited defendants in jail who were her friends/acquaintances and spoke with them about their cases when it was not one of her own cases. | 2 |
| Officers spent time in the Municipal Court building to stay away from the police department when Plaintiff was there. | 1 |
| When Plaintiff was in the building, there was less productive work going on. | 1 |

[*Id.* at 4–7.] Barrett met with Cotton and Dixon to deliver and discuss her findings, and during that meeting, Barrett also reviewed all her interview notes and summaries of conversations with the individual officers. [Doc. 31-7 at 8:13–10:11.] Barrett's recommendation was that Plaintiff should be terminated. [Doc. 31-3 at 112:8–10.]

**Plaintiff's Termination**

After receiving the report from Barrett, Dixon and Cotton discussed options for disciplining Plaintiff, including suspension, demotion, and termination. [Docs. 31-7 at 20:20–21:10; 31-9 at 59:17–20.] Dixon testified that "when [he] read and reviewed the final report . . . it was very evident from what [Barrett] had written and what she had revealed in her report that the police department couldn't continue forward as long as [Plaintiff] was there." [Doc. 31-9 at 28:15–19.] Cotton testified that he was concerned by the number of officers who shared this perception of Plaintiff and because of the severity of statements by the officers, he and Dixon did not feel that retaining Plaintiff in a demoted position would allow for a cohesive police department. [Doc. 31-7 at 20:8–9, 21:14–17.] Cotton believed that as a result of this discussion with Dixon, the two mutually decided to terminate Plaintiff, but also testified that his role in the decision to terminate Plaintiff was to confirm or deny the ultimate recommendation from Dixon.[7] [*Id.* at 7:19–25, 8:7–9, 21:18–21.] Dixon testified that the decision to terminate was solely his. [Doc. 31-9 at 59:17–24.]

On October 16, 2013, Plaintiff was informed by Dixon, with Taylor present, that she had twenty-four hours to either resign and accept three months' severance or be

---

[7]Cotton explained that he hires, fires, disciplines, or promotes department heads with the consent of City Council, and department heads hire, fire, discipline, or promote with the consent of Cotton. [Doc. 31-7 at 8:2–6.]

10

terminated. [Doc. 35-1 ¶ 13.] Plaintiff was terminated on October 17, 2013. [*Id.*] Plaintiff alleges that her termination was retaliation for her complaints of race discrimination and sex discrimination.[8] [Doc. 1-1 ¶¶ 12, 17–18.]

## APPLICABLE LAW

### Summary Judgment Standard

Rule 56 states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the

---

[8]Although the Complaint cites Title VII and 42 U.S.C. § 1981 and categorizes the causes of action as retaliation/race discrimination and retaliation/sex discrimination [Doc. 1-1], during Plaintiff's deposition, the parties stipulated that this case raises solely retaliation claims under Title VII based on Plaintiff's complaint in June 2013 about race discrimination in connection with vandalism to her vehicle and based on Plaintiff's complaint in July 2013 about sex discrimination in connection with inappropriate relationships in the workplace [Doc. 31-13 at 7:23–8:21].

11

non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  *Anderson,* 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

**DISCUSSION**

Under Title VII, an employer is forbidden from taking action that discriminates against an employee because that employee has either "opposed any practice made an unlawful employment practice by this subchapter" or has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[9]  42 U.S.C. § 2000e–3(a).  The purpose of this antiretaliation provision is to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's most basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

A plaintiff may establish a violation of Title VII's antiretaliation provision either through direct and indirect evidence of retaliatory animus or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[10]  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  Under the burden-shifting framework, an employee must first prove a prima facie case of retaliation.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nonretaliatory reason for the adverse employment action.  *Id.*  By providing such an explanation, the employer rebuts the presumption of retaliation created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing

---

[9] Through the two clauses of the antiretaliation provision, Title VII protects activities that "fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).  Here, Plaintiff alleges she engaged in opposition activity.

[10] Plaintiff relies exclusively on the *McDonnell Douglas* burden-shifting scheme in this case.  [*See* Doc. 35.]

the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)).  If the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for retaliation.  *McDonnell Douglas*, 411 U.S. at 804.

Defendant first contends Plaintiff cannot establish a prima facie case of retaliation. [Doc. 31-1 at 14–25.]  To establish a prima facie case of retaliation, the plaintiff must demonstrate "(1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action."  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)).  The Court agrees Plaintiff cannot establish a prima facie case of retaliation.

**Protected Activity**

Defendant first argues Plaintiff did not engage in protected opposition activity. [Doc. 31-1 at 14–19.]  Plaintiff alleges she engaged in protected activity when she raised concerns of differential treatment based on race, of vandalism to her car being racially motivated, and of alleged indiscretions and sexual harassment. [Doc. 35 at 17–24, 33–35.]

Protected opposition activities include complaints about suspected violations of Title VII.  *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003).  Title VII "protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *E.E.O.C. v. Navy Fed'l Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (citations omitted).

14

Moreover, "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (citations omitted).

"[T]he threshold for oppositional conduct is not onerous." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). Recently, the Fourth Circuit Court of Appeals expanded the scope of what may be considered a protected activity. In *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc), the court "made clear that [courts] should . . . interpret 'unlawful employment practice' broadly." *DeMasters*, 796 F.3d at 417 (citing *Boyer-Liberto*, 786 F.3d at 282)). As explained in *Boyer-Liberto*, the Supreme Court has held that "Title VII must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Boyer-Liberto*, 786 F.3d at 283 (quoting *Burlington N.*, 548 U.S. at 66–67) (alterations in *Boyer-Liberto*). Thus, the *DeMasters* court reversed the grant of summary judgment on a retaliation claim in part based on the district court's "myopic analysis" of the plaintiff's opposition as a series of discrete acts. *DeMasters*, 796 F.3d at 417. The court counseled,

> We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination," *Crawford [v. Metropolitan Gov't of Nashville and Davidson Cty., Tenn.*], 555 U.S. [271,] 276[ 2009]; and (2) concerns subject matter that is "actually

15

> unlawful under Title VII" or that the employee "reasonably believes to be unlawful," *Boyer-Liberto*, 786 F.3d at 282.

*DeMasters*, 796 F.3d at 418 (emphasis in *DeMasters*) (alteration in *Crawford*).

Here, Plaintiff complained (a) in 2006 about not having an opportunity to apply for the major position and proceeded through the grievance process; (b) in June 2013 about the department's handling of incidents involving people of color and vandalism to her car, advising Dixon that if anything happened again, she would file a complaint with the EEOC; (c) in July 2013 about indiscretions and inappropriate behavior that she believed was sex harassment; and (d) in September 2013 about issues with Link, advising that she would not tolerate anymore harassment and lies. Although each of these complaints may not individually constitute protected activity under Title VII,[11] the Court should not evaluate the complaints as a series of discrete acts. *See id.* at 417. Examining the course of Plaintiff's conduct through a panoramic lens as instructed in *DeMasters*,[12] the undersigned declines to find that Plaintiff did not engage in protected activity.

---

[11] For example, in *Crowley v. Prince George's Cty.*, 890 F.2d 683 (4th Cir. 1989), the Fourth Circuit Court of Appeals held that an employee's allegation that he had been retaliated against for investigating instances of racial harassment perpetrated by police officers against members of the community was not cognizable under Title VII because the claimed discrimination did not relate to a practice of employment. *Id.* at 687; *see also Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (holding a claim of retaliation was not cognizable under Title VII because the plaintiff officer challenged the department's discriminatory treatment of the public but his opposition was not directed at an unlawful employment practice of his employer).

[12] Although the parties stipulated that this case raises retaliation claims based on Plaintiff's complaint in June 2013 about race discrimination in connection with vandalism to her vehicle and based on Plaintiff's complaint in July 2013 about sex discrimination in connection with inappropriate relationships in the workplace [Doc. 31-13 at 7:23–8:21], given the directive to view conduct through a panoramic lens rather than as discrete acts, the Court has looked at all of Plaintiff's complaints to determine whether she engaged in protected activity.

**Causal Connection**

Defendant also argues Plaintiff cannot show causation. [Doc. 31-1 at 19–25.] Plaintiff contends a causal connection exists between her complaints and termination because of the temporal proximity, Chief Dixon's exhibiting retaliatory animus,[13] and her exceptional performance for more than 24 years. [Doc. 35 at 24–28, 35.]

To prove a causal connection, a plaintiff asserting a retaliation claim must be able to show that her employer took the adverse action "'*because* the plaintiff engaged in a protected activity.'" *Holland*, 487 F.3d at 218 (emphasis in original) (quoting *Dowe v. Total Action Against Poverty in Roanoake Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). In certain circumstances, "very close" temporal proximity between the protected activity and the adverse action can be probative of a causal connection. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001).

Here, the parties disagree about which date—the 2006, June 2013, July 2013, or September 2013 complaint—should be used to determine the length of time between the protected activity and Plaintiff's termination in October 2013. [*See* Docs. 31-1 at 19–25; 35 at 24–26.] However, even if the Court uses the September 2013 complaint date and finds that the one-month time period between that complaint and Plaintiff's termination is

---

[13]Plaintiff avers that after she complained, Dixon distanced himself from her. [Doc. 35-1 ¶ 12.] She states that before her complaint, Dixon and Plaintiff met in the mornings to discuss both personal and departmental matters; after her complaint, Dixon stopped having those conversations with Plaintiff. [*Id.*] Further, Dixon stopped taking Plaintiff to sheriff's meetings and started sending a captain to meetings that the second in command was to attend. [*Id.*] Finally, Dixon stopped going to lunch with Plaintiff and also stopped calling her directly regarding departmental issues, using electronic mail to communicate instead. [*Id.*] Plaintiff contends that Dixon's distancing himself from her establishes retaliatory animus occurring between her protected activity and termination. [Doc. 35 at 26–27.]

sufficient to establish a causal connection, intervening events occurred between Plaintiff's complaints and her termination that had a direct bearing on the adverse employment action.  *See Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (holding that "intervening events eroded any causal connection suggested by the temporal proximity of [the employee's] protected conduct and her layoff"); *Brown v. Brennan*, No. 4:14-cv-00307-RMG, 2015 WL 2452751, at *13 n.10 (D.S.C. May 21, 2015) ("Between the time Plaintiff first contacted the EEOC and the Notice of Removal was issued, she was indicted on criminal charges, thus breaking any causal connection between the two events.") (citing *Cheshewalla*, 415 F.3d at 852); *Christy v. City of Myrtle Beach*, No. 4:09-cv-1428-JMC-TER, 2012 WL 2149777, at *7 (D.S.C. Apr. 26, 2012) (finding that an intervening event broke any connection between an employee's protected activity and demotion).  Moreover, these intervening events occurred after Chief Dixon's allegedly distancing himself from Plaintiff[14] and also negate any inference of a causal connection based on Plaintiff's exceptional performance record.  Link's five-page letter to Cotton, notifying him of her intent to file a grievance against Plaintiff, prompted Barrett's investigation and report. [Doc. 31-7 at 14:23–15:24.]  Barrett's recommendation was that Plaintiff should be terminated. [Doc. 31-3 at 112:8–10.]  Dixon testified that "when [he] read and reviewed the final report . . . it was very evident from what [Barrett] had written and

---

[14]Defendant argues that "[n]one of the items cited by Plaintiff, to the extent they are even admissible, show retaliatory animus." [Doc. 39 at 8–9.]  The Court need not determine the admissibility of Plaintiff's averments or whether they demonstrate retaliatory animus because, as discussed, even if Plaintiff establishes a causal connection, an intervening event breaks the causal chain.

what she had revealed in her report that the police department couldn't continue forward as long as [Plaintiff] was there." [Doc. 31-9 at 28:15–19.]

Although Plaintiff contends Link's complaint cannot be an intervening event that breaks the causal connection because Link had previously complained to Dixon and Dixon had determined that Plaintiff's behavior was not bullying or harassment [Doc. 35 at 27], this argument ignores that Link's September 13, 2013 letter expressing her intent to file a grievance was sent to Cotton, not Dixon [Doc. 35-6], and ignores Barrett's investigation and report. After receiving Link's letter, Cotton asked Barrett to investigate the grievance.[15] [Doc. 31-7 at 15:5–6.] Both Dixon and Cotton testified that Barrett's report led to the conclusion that the department could not continue with Plaintiff remaining employed.[16] [Docs. 31-7 at 20:8–9, 21:14–17; 31-9 at 28:15–19.] Thus, Link's complaint and the ensuing investigation and report break any connection between Plaintiff's complaints and her termination,[17] and Plaintiff cannot establish a prima facie case of retaliation.[18]

---

[15]Plaintiff does not contend that Cotton and/or Barrett knew about Plaintiff's complaints to Dixon.

[16]Although Plaintiff appears to challenge Barrett's report, asserting that it is not objective or thorough [Doc. 35 at 10], Plaintiff has produced no evidence suggesting that Dixon and Cotton did not believe the department could not continue cohesively if Plaintiff remained employed. Moreover, Plaintiff's argument that Dixon did not believe the conduct Link complained of was bullying or harassment fails to address Dixon's testimony that "it was very evident from what [Barrett] had written and what she had revealed in her report that the police department couldn't continue forward as long as [Plaintiff] was there." [Doc. 31-9 at 28:15–19.] Dixon also testified that the report made him realize there were more people involved than just Link [*id.* at 28:23–24] and that "apparently others saw [Plaintiff's bullying] . . . and [Dixon] just didn't" [*id.* at 40:14–15].

[17]Moreover, Dixon gave Plaintiff an outstanding performance evaluation that resulted in a 3.5% pay raise after she complained. [Doc. 13-14 at 43–47]; *see Joiner v. Wal-Mart Stores, Inc.*, 114 F.Supp.2d 400, 410 (W.D.N.C. 2000) ("This lack of temporal proximity is especially lacking where, as here, a plaintiff received favorable evaluations and *promotions*

19

**RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Defendant's motion for summary judgment be GRANTED.

IT IS SO RECOMMENDED.

                                          s/Jacquelyn D. Austin
                                          United States Magistrate Judge

May 10, 2016
Greenville, South Carolina

---

between the time he complained and when he was fired." (emphasis in original)).

[18]Additionally, Defendant has articulated a legitimate, nonretaliatory reason for not promoting Plaintiff, and Plaintiff has failed to establish a genuine issue of material fact remains as to whether the articulated reason is pretext for unlawful retaliation. Defendant argues Cotton and Dixon based their decision to terminate Plaintiff on Barrett's report. The Court concludes Defendant has met its burden under *McDonnell Douglas* to produce evidence from which a jury could conclude Defendant had a legitimate, nonretaliatory reason for terminating Plaintiff. Accordingly, the Court will consider whether Plaintiff has met her burden of demonstrating that Defendant's proffered reason is merely a pretext for retaliation, which would indicate whether Plaintiff could meet her ultimate burden of persuasion and demonstrate retaliation vel non. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) ("The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional [retaliation],' which at all times remains with the plaintiff." (first alteration in *Merritt*) (quoting *Burdine*, 450 U.S. at 256)).

To prove an employer's articulated reason is a pretext for retaliation, a plaintiff "must prove '*both* that the reason was false, *and* that [retaliation] was the real reason' for the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (quoting *St Mary's Honor Ctr.*, 509 U.S. at 515). Upon review of the record, the Court determines Plaintiff has failed to demonstrate a genuine issue of material fact as to whether Defendant's proffered reason for terminating Plaintiff is merely a pretext for retaliation. Plaintiff's arguments regarding pretext focus solely on whether the proffered reason is false, and Plaintiff offers no evidence to suggest that retaliation was the real reason for her termination. [Doc. 35 at 28–33.] Plaintiff may not rely on the holding in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]," because Plaintiff has not established a prima facie case of retaliation.